UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-80055-Cr-ROSENBERG/HOPKINS

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MARC ELIE JEAN-CHARLES,

Defendant.

_____/

**REPORT AND RECOMMENDATION ON GOVERNMENT'S MOTION *IN LIMINE* TO PROHIBIT ENTRAPMENT DEFENSE (DE 173)**

THIS CAUSE is before the Court upon the District Court's referral (DE 175) of Government's motion *in limine* to prohibit an anticipated entrapment defense (DE 173). The Defendant responded (DE 188). Hearings were held on December 1 and 2, 2015.

At the hearings Government agents Michael Connors, an undercover agent, and Richard Silva, the case agent, testified. Recordings and transcripts of meetings held on March 11 and 17, 2015, were introduced into evidence. The Defendant also testified, although he asserted his Fifth Amendment privilege during cross-examination and thereafter refused to testify further.

## I.    FINDINGS OF FACTS

The government agents' testimony at the hearing was corroborated by audio and video recordings. The Defendant's testimony was incredible and ultimately . Defendant's account of having walked away from the UC without answering when twice asked on March 17, 2015 if he

was comfortable with the plan was belied by the recording. He refused to explain why he might have hesitated when he later agreed to go through with the plan. He claimed to have been shown a video by prior counsel that supported his account, but his current counsel represented that no such recording was in the possession of the defense. The Defendant refused to answer cross-examination questions about his account, based upon his Fifth Amendment privilege, even after being warned that his testimony would be stricken if he refused to answer.

Based upon the evidence provided at the hearings, this Court makes the following findings of fact. In February 2015, an investigation of a drug trafficking organization operating in Palm Beach County was commenced based on information from a Confidential Source (hereinafter referred to as CS) regarding codefendants Ryan POST and his brother, Justin POST.

According to the CS, Ryan POST and Justin POST had asked the CS if he knew of any drug stash house locations they could rob for money or drugs. The CS told agents that Ryan POST had inquired about this type of information numerous times in the past and both subjects (Ryan POST and Justin POST) had bragged of their recent involvement in robberies of two stash houses. The CS told Ryan POST he knew an individual – ATF Special Agent Michael Connors, acting in an undercover capacity (hereinafter the "UC") – who picked up and delivered loads of cocaine for a Columbian drug cartel, who he believed would be interested in working with POST.

On March 11, 2015, agents met with the DEA CS and conducted controlled phone calls to Ryan POST, "Larry" (later identified as Larry Y.[1]) and "Chico" (later identified as codefendant Ruben BABILONIA), to set up a meeting with the ATF undercover agent. Prior to placing the phone call, the CS advised that he met with Larry before meeting with the agents.  Larry obtained

---

[1] Hereinafter referred to as "Larry."   Larry ultimately did not participate in the home invasion robbery and was not charged.   At no time was Larry working in any capacity as an agent or informant of law enforcement in this matter.

BABILONIA's number from Ryan POST, and gave it to the CS to call him and arrange the meeting.

Shortly thereafter on March 11, the CS made a controlled phone call to Ryan POST, but received no answer. The CS then placed a controlled phone call to Larry, and told him to contact BABILONIA to let him know that the CI would be calling him.  Subsequently Larry called back the CS and stated that he talked to BABILONIA over the phone and that BABILONIA advised him that he didn't want to talk to the CS over the phone.  BABILONIA felt comfortable to have Larry and the CI come to his house to arrange the meeting with the UC.  Later the CS made a controlled phone call to Larry, and both agreed that the CS would pick up Larry at Ryan POST's residence in an hour.

Later that day the CS drove to pick up Larry, and then met with BABILONIA and another unknown male.  While the CS was at the residence he contacted the UC and asked if he was available to meet. The UC informed the CS that he was available to meet at a specified Winn Dixie parking lot in thirty minutes. The CS drove BABILONIA, Larry, and the unknown male (later identified as codefendant Derrick THOMPSON) to meet with the UC Agent.

DEA/ATF Agents set up surveillance at the Winn Dixie parking lot in West Palm Beach, FL. UC Agent Connors arrived and parked next to the CI's vehicle. Agents observed UC Agent Connors, the CS, and BABILONIA exit their vehicles and engage in conversation.  Larry and THOMPSON remained seated inside the CI's vehicle, and did not participate in the conversations between the UC, CS, and BABILONIA.

The UC (SA Connors) and DEA CS met with Ruben BABILONIA in the parking lot of the Winn Dixie.  SA Connors arrived at the meeting and was introduced by the CS to

BABILONIA. The meeting was recorded.

SA Connors told BABILONIA he owned a cargo company and about a year ago was introduced to some Columbian associates of someone who worked for SA Connors. SA Connors told BABILONIA the Columbians were in the cocaine business and asked if SA Connors would be interested in making extra money by hiding one or two kilograms of cocaine on his truck and delivering it "up north," to places like South Carolina and Savannah, Georgia. SA Connors said he agreed and has been working for the Columbian drug trafficking organization (DTO) for over a year, at first he was picking up one kilogram of cocaine every three to four weeks but now it was one or two kilograms every two to three weeks. SA Connors said the Columbians would call him the day before the scheduled pick up of cocaine and tell him to be ready the following day. SA Connors said the following day the Columbians would call and give him the address to a stash house. The stash house locations were different every time and the Columbian DTO used vacant houses. SA Connors said when he arrived at the stash house it was always the same two Columbians at the stash house and they were always armed with handguns. When he went into the stash house he always saw 20 kilograms of cocaine in the house. SA Connors said he would pick up his one or two kilograms of cocaine and then leave the stash house. SA Connors said the Columbians are not paying him as much as they said they would and SA Connors needed more money. He was looking for an experienced crew to rob the Columbian stash house of 20 kilograms of cocaine. SA Connors said he wanted five kilograms of cocaine as his share of the armed robbery. He said it cannot appear as though he was involved in the armed robbery because the Columbians would kill him and his family. SA Connors asked BABILONIA if the armed robbery was something he could handle.

BABILONIA said "[i]f we wait until you come out (of the stash house) it's gonna come

back on you.   Unless you don't care.   I think it's better if we do it while you inside.   That's what I want to know.   I can handle the rest.   I have the guys, I have the weapons.   I have the team."   SA Connors asked BABILONIA if he had experience (conducting this type of armed robbery).   BABILONIA replied "Of course that's what I do.   All day long.   I been doin' this in Palm Beach forever."   SA Connors said the Columbians are consistent with the cocaine every month and always have 20 kilograms.   SA Connors said the only time it was slow was around Christmas.   BABILONIA replied, "[t]hat was everybody not just them."   SA Connors said again that he wanted 5 kilograms as his share of the stolen cocaine.   BABILONIA replied "OK 5.   That's not greedy at all."   BABILONIA said "I can guarantee on my end everything gonna be straight.   I can handle it.   I can handle it with four guys, me and three others.   We will bring rifles so it's more intimidating."   SA Connors said he wanted to meet with BABILONIA and his crew to discuss the plan.   BABILONIA said "I will have my guys ready tomorrow. Call me and we will all meet."   BABILONIA gave SA Connors his cell phone number and said his name was Ruben but everyone calls him "KILO".   BABILONIA assured SA Connors again that he could handle the armed robbery.   BABILONIA said "[i]t's the element of surprise.   As soon as you go in, we go in and lay everybody down."   SA Connors warned BABILONIA that the kilograms of cocaine had a stamp on them (identifying them as property of the Columbians). BABILONIA told SA Connors not to worry about that because he had a rewrap machine and a kilogram press so he could rework the cocaine.   SA Connors agreed to meet BABILONIA and his crew the following week to further discuss the planned armed robbery of twenty kilograms of cocaine.

On March 17, 2015, a recorded meeting occurred at a parking lot of the Sam's Club, in West Palm Beach, Palm Beach County, Florida with BABILONIA so UC Connors could meet

the members of his robbery crew that would be participating in the stash house robbery, RYAN POST (R. POST), MARC ELIE JEAN-CHARLES, TEVIN RESHAWN SAINTELIEN and DERRICK RAMON THOMPSON. UC Connors told R.POST, **JEAN-CHARLES**, SAINTELIEN and THOMPSON, and reiterated for BABILONIA, what he had discussed during the March 11, 2015, meeting.     UC Connors explained that he (UC Connors) was a disgruntled narcotics courier seeking someone to rob the Columbian DTO for whom he worked, of at least 20 kilograms of cocaine stored at a stash house guarded by two men, both of whom would be armed with handguns. The UC told them that he needed to get banged up (so the Columbians would not know he was involved). BABILONIA related that they would pretend to be police, with SWAT vests and handcuffs. He related that none of his crew were first-timers. The UC asked the crew members if they felt "comfortable with it" and they replied in the affirmative with Defendant Jean-Charles responding, "[h]ell yeah." (GX5, pg 2; GX 7, 46:25).

On April 2, 2015, the UC met BABILONIA, R. POST, **JEAN-CHARLES**, SAINTELIEN and THOMPSON, at an undercover facility in Broward County.  They were there to wait for the DTO to call the UC to reveal the address of the stash house where the cocaine the UC was to courier for the DTO was located. Once at the undercover facility, BABILONIA, R. POST, **JEAN-CHARLES**, SAINTELIEN and THOMPSON had further recorded discussions with UC Connors on how they planned to rob the cocaine stash house. These conversations primarily occurred in a small conference room inside the facility during which all the conspirators were present and observable on camera. BABILONIA, **JEAN-CHARLES**, SAINTELIEN and THOMPSON were planning to go inside the stash house while R. POST would wait outside as the driver.  BABILONIA said they were going to yell "Police, Police" immediately when they entered the stash house in the hopes of gaining the

advantage over the two armed stash house guards. Stating that while meaning them "no disrespect," UC Connors asked whether he could count on the conspirators acting "without hesitation" because it was his life on the line.   BABILONIA responded on behalf of the group in the clear affirmative, adding that although they appeared young, everyone there had done these (home invasion robberies) before.   After briefly adjourning to the undercover facility garage to don their "tactical" garb and prepare their firearms to commit the home invasion robbery (all of which is captured on videotape), BABILONIA, R. POST, **JEAN-CHARLES**, SAINTELIEN and THOMPSON were subsequently arrested without incident at the undercover facility.

The following items were recovered from JEAN-CHARLES incident to his arrest:

- Knit skull face mask (worn around neck).
- One black long sleeve Cottonet 3XL T-shirt (wearing, upper body).
- Black "Soulja" jeans with belt (worn lower body).
- One silver magazine loaded with 10 rounds of .40 caliber round of ammunition (front left pants pocket).
- Two set of "Fury Tactical" hinged hand cuffs (rear left pants pocket).
- One red bandana and one white bandana (rear right pant pocket).
- Springfield Armory .40 caliber semi-automatic pistol, model: XD-40, serial number: US444584 loaded with 1 round of .40 caliber ammunition in the chamber and one high capacity magazine containing 15 rounds of .40 caliber ammunition for a total of 16 rounds of ammunition.

Following **JEAN-CHARLES's** arrest on April 2, 2015, PBSO Detective Jarrod Foster met with **JEAN-CHARLES** and post-<u>Miranda</u>, **JEAN-CHARLES** stated that he was asked by associate, Ruben BABILONIA, to travel with him to Broward County in order to rob the occupants of a residence for drugs and money. He said that he has known BABILONIA for approximately four years. **JEAN-CHARLES** advised that he expected to receive two ounces of cocaine and $2,000 US currency for his part in the robbery. He further stated that while inside the undercover warehouse, BABILONIA handed him the Springfield 40 cal. handgun that was ultimately found in his possession.

## II.    <u>DISCUSSION</u>

Defendant JEAN-CHARLES confirmed that he intends to present an entrapment defense at trial of this matter.

"Entrapment" is an affirmative defense which "requires two elements: (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." *United States v. Brown*, 43 F.3d 618, 623 (11th Cir.1995) (citing *Mathews v. United States*, 485 U.S. 58 (1988)). A defendant's right to present the entrapment defense, however, "'is conditional, since before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid entrapment defense must be present.'" *United States v. Sistrunk*, 622 F.3d 1328, 1333 (11th Cir. 2010), *cert. denied*, 562 U.S. 1242 (2011)(quoting *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002) (alteration omitted)).

It is "well-settled precedent" in this Circuit, however, that "'[a] defendant cannot avail himself of an entrapment defense unless the initiator of his criminal activity is acting as an agent of the government.'"   *United States v. Isnadin*, 742 F.3d 1278, 1308 (11th Cir. 2014)(quoting *United States v. Mers*, 701 F.2d 1321, 1340 (11th Cir.1983), *cert. denied*, 464 U.S. 991 (1983)) (the purpose behind the entrapment defense is "to prohibit the [G]overnment from directly involving an otherwise disinterested and disinclined person [in the commission of] a criminal offense. When the Government has no contact with the accused, that purpose has no relevance; therefore, without direct Government communication with the defendant, there is no basis for the entrapment defense")).

The Eleventh Circuit in *United States v. Andrews*, 765 F.2d 1491, 1499 (C.A.11 (Ala.),1985), outlined the process for assessing if an entrapment defense can be raised:

A defendant who seeks to raise a defense of entrapment must first come forward with evidence sufficient to raise a jury issue "that the government's conduct created a substantial

risk that the offense would be committed by a person other than one ready to commit it." *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975). A defendant will be considered to have met this burden if he produces "any evidence" that governmental conduct created such a risk, *Pierce v. United States*, 414 F.2d 163 (5th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969), but evidence that the government agent sought out or initiated contact with the defendant, or was the first to propose the illicit transaction, has been held to be insufficient to meet the defendant's burden. *United States v. Humphrey*, 670 F.2d 153 (11th Cir.1982); *United States v. Hill*, 626 F.2d 1301 (5th Cir.1980). The defendant must demonstrate not merely inducement or suggestion on the part of the government but "an element of persuasion or mild coercion." *United States v. Hill, supra*. The defendant may make such a showing by demonstrating that he had not favorably received the government plan, and the government had had to "push it" on him, *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979), or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate, *United States v. Timberlake*, 559 F.2d 1375 (5th Cir.1977). When the defendant makes such a showing, the burden shifts to the government to demonstrate beyond a reasonable doubt that the defendant was predisposed to commit the offense charged.

Here the defense failed to demonstrate government persuasion or coercion. There was no showing that Defendant had not favorably received the Government plan, that the Government had to "push it" on him, or that he had refused to participate. *Andrews* at 1499. To the contrary, all the credible evidence reflects that Defendant was committed to the plan before meeting with the Government. He was not initially recruited by the Government and demonstrated by his presence at the meetings and his express and implied assent that he was a willing recruit.

The Defendant's testimony was incredible and ultimately untested by cross-examination since he asserted his Fifth Amendment privilege even in the face of having his testimony stricken.   *See United States v. Banks*, 761 F.3d 1163, 1193-94 (10th Cir. 2014); *United States v. Constantine*, 263 F.3d 1122, 1128 n. 4 (10th Cir.2001) ("It is well established that a witness ... may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." (quoting *Mitchell v. United States*, 526 U.S. 314, 321, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999)) (internal quotation marks omitted); *Id.* ("The illogic of allowing a witness to offer only self-selected testimony should be obvious even

to the witness.").

In view of the foregoing, raising an "entrapment" claim at trial could serve but one purpose, to cause jury confusion or nullification.   It is well-settled that federal case law prohibits a jury nullification defense.   *United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998), *cert. denied*, 524 U.S. 962 (1998)("defense counsel may not argue jury nullification during closing argument.   Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence."); *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir.1992) ("defense counsel may not encourage the jurors to ignore the court's instruction and apply the law at their caprice") (citations and internal quotation marks omitted); *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir.1983) (holding "that defense counsel may not argue jury nullification during closing argument"); *United States v. Smith*, 2009 WL 692149 (S.D. Ala. 2009)("Any effort by Smith at trial to encourage or solicit jury nullification would be improper; therefore, the Government's Motion in Limine is granted in this respect, as well."); *see also Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir.)(Trott, J., concurring), *cert. denied*, 506 U.S. 1021 (1992)("I believe neither a defendant nor his attorney has a right to present to a jury evidence that is <u>irrelevant</u> to a <u>legal</u> defense to, or an element of, the crime charged.   Verdicts must be based on the law and the evidence, <u>not</u> on jury nullification as urged by either litigant." (emphasis in original)); *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983)("Appellant's jury nullification argument would have encouraged the jurors to ignore the court's instructions and apply the law at their caprice.   While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath. We therefore join with those courts which hold that defense counsel may not argue jury

nullification during closing argument.");   *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975)(affirming trial court's refusal to admit evidence bearing no legal relation to the charges but which might encourage a "conscience verdict" of acquittal), *supplemented by* 536 F.2d 410 (D.C. Cir. 1976);   *United States v. Lucero*, 895 F. Supp. 1421 (D. Kan. 1995)("defendant's are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.   The evidence defendant's wish to present is irrelevant to any material issue in the case and is thus to be excluded under Federal Rule of Evidence 402.   Furthermore, even if such evidence were relevant, its probative value would be substantially outweighed by the likelihood that its presentation would result in unfair prejudice and confusion of the issues . . . under Federal Rule of Evidence 403.").

For those reasons this Court **RECOMMENDS** that the Government's motion *in limine* to prohibit an anticipated entrapment defense (DE 173) be **GRANTED**.

**In view of the impending trial**, a party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Robin L. Rosenberg, **within one (1) day after being served with a copy, that is, by December 3, 2015**. *See* 28 U.S.C. § 636(b)(1)(C).   Failure to file timely objections may limit the scope of appellate review of factual findings contained herein.   See *United States v. Warren*, 687 F.2d 347, 348 (11th Cir.1982) *cert. denied*, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of

Florida, this 2 day of December, 2015.

*James M. Hopkins*

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:
Honorable Robin L. Rosenberg

Counsel of record